**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 11-cv-03231-CMA-MJW (Consolidated for All Purposes with
Civil Action No. 11-cv-03404-CMA-KMT and
Civil Action No. 12-cv-00240-CMA-KMT)

FIRSTIER BANK, KIMBALL, NEBRASKA, a Nebraska Bank,

      Plaintiff,

v.

FEDERAL DEPOSIT INSURANCE CORPORATION, as Receiver for
FIRSTIER BANK, LOUISVILLE, COLORADO, a Colorado Bank in receivership,

      Defendants.

---

**ORDER GRANTING FDIC'S MOTIONS TO DISMISS IN CONSOLIDATED
CASES NO. 12-CV-00240, NO. 11-CV-03231, AND NO. 11-CV-03404**

---

      This matter is before the Court on the Federal Deposit Insurance Corporation's

("FDIC") Motion to Dismiss Amended Third Amended Complaint ("Third Amended

Complaint") in Case No. 12-cv-00240 (*Adams I*).[1] (Doc. # 75.)  Also before the Court is

the FDIC's Motion to Dismiss in the above-captioned case (Doc. # 23), the FDIC's

Motion to Dismiss in *Adams II* (*Adams II*, Doc. # 32), and the FDIC's Motion to Dismiss

FTB-NE's Cross-Claim in *Adams II*.  (Doc. # 37.)

---

[1]   Unless otherwise noted, all document citations are to the docket of Case No. 11-cv-03231,
the lowest-numbered case of the three civil actions that were consolidated by this Court on May
8, 2012.  (Doc. # 24.)  When the Court cites to a docket entry in Case No. 12-cv-00240, the
Court will use the convention (*Adams I*, Doc. # ___).  When the Court cites to a docket entry
in Case No. 11-cv-03404, the Court will use the convention (*Adams II*, Doc. # ___).

# I.  BACKGROUND

These three consolidated cases relate to a $17 million real estate loan (the "Loan") originated by FirsTier Bank, Louisville, Colorado ("FTB-CO") to Everest Marin, LP, and two nearly identical loan participation agreements between FTB-CO and Adams Bank & Trust ("Adams") and FTB-CO and FirsTier Bank, Kimball, Nebraska ("FTB-NE"). The heart of this dispute is Adams' contention that it is entitled to "Last-in First-out" ("LIFO") priority under its Loan Participation Agreement, whereas the FDIC[2] and FTB-NE contend that any proceeds from the sale of the real estate securing the Loan (the "Real Estate") should be distributed *pro rata* among the originating lender and both participants.

## A.     FACTS[3]

On or about June 5, 2008, FTB-CO simultaneously entered into participation agreements with FTB-NE and Adams, under which FTB-CO agreed to participate $6,000,000 of the Loan to FTB-NE and $3,235,000 to Adams.  (Doc. # 3, ¶ 8.)  When the 2008 Participation Agreements were nearing maturity, FTB-CO approached FTB-NE and Adams about signing new participation agreements.  (*Id.*, ¶ 11.)  On July 2, 2009, both Adams and FTB-NE signed new participation agreements (collectively the "Participation Agreements").  (Doc. # 23-2 at 34-37; Doc. # 65-1.)  FTB-CO again

---

[2]  On January 28, 2011, FTB-CO was declared insolvent and the FDIC was appointed as its receiver.  (*Adams I*, Doc. # 1 at 2.)

[3]  The following facts are taken from Adam's Third Amended Complaint in *Adams I* (Doc. # 65) and from FTB-NE's Amended Complaint in Case No. 11-cv-03231.  (Doc. # 3.)   Additional facts will be provided in the analysis section.

participated $6,000,000 of the Loan to FTB-NE and $3,235,000 to Adams. (*See id.*)

The Participation Agreements contain the following provisions relevant to the instant

cases:

> **UNDERLYING LOAN**.  Originating Institution [FTB-CO] has agreed to make, or has made, a loan to EVEREST MARIN, L.P. . . . The Originating Institution desires to sell and grant to the Participant, and the Participant desires to purchase and accept from the Originating Institution, a participation interest in the Originating Institution's rights and obligations under the Loan subject to the terms and conditions set forth therein.

> **SALE OF LOAN PARTICIPATION INTEREST**.  The Originating Institution hereby sells to the Participant, and the Participant hereby purchases from the Originating Institution a participation in the Originating Institution's rights and obligations with respect to the Loan . . . The sale is made by the Originating Institution without recourse and shall in no way be construed as an extension of credit by the Participant to the Originating Institution.

> **Application of Payments**.  Upon receipt of a payment of principal, interest, fees, or other payments under the Loan, or whenever Originating Institution makes an application of funds to the Loan (including, without limitation, any payment or application from ay property or deposit held or taken by the Originating Institution in connection with the Loan, whether as Collateral or otherwise), Originating Institution will promptly pay to the Participant . . . an amount equal to the Participant's Participation interest of each amount received and applied by the Originating Institution in payment of principal, interest on the Loan, shared fees, or other payments in respect of the Loan.  Such application of funds shall be on a [LIFO] basis with Participant's Participation Interest being distributed first before the application of funds to the Originating Institution.  Notwithstanding the above, upon the occurrence of an event of default with respect to the Loan, all expenses incurred in collecting the Loan as well as all collected funds shall be shared between the Originating Institution and Participant on a pro rata basis until such default is cured.

> **Borrower's Default: Enforcement**: . . . Upon the occurrence of any default under the Loan Documents . . . [t]he Originating Institution and the Participant shall share ratably in the income and expense incurred pursuant to this paragraph, including all necessary expenses incurred in payment of taxes, insurance, premiums, prevention of wasting of assets,

repairs, maintenance, construction of improvements, management court costs, reasonable attorneys' fees, and other similar expenses.

(Doc. # 23-2 at 34-37; Doc. # 65-1 at 1-4) (emphasis and capitalization in original).

There is only one difference between the Participation Agreement signed by Adams and the Agreement signed by FTB-NE. The "Purchaser First Out" clause in FTB-NE's Agreement states: "100% of payments before Default until such time as Purchaser has received Purchaser's Investment plus interest thereon at Purchaser's Interest Rate." (Doc. # 23-2 at 36.) The "Purchaser First Out" clause in Adams' Agreement states: "100% of payments until such time as Purchaser has received Purchaser's Investment plus Interest thereon at Purchaser's Interest Rate Regardless of Default." (Doc. # 65-1 at 3.)

In accordance with the Participation Agreements, Adams remitted $3,235,000 to FTB-CO and FTB-NE remitted $6,000,000 to FTB-CO. (Doc. # 3, ¶ 34; Doc. # 65, ¶ 7.) Sometime during 2009, the borrower, Everest Marin, defaulted on the Loan and the Real Estate was foreclosed upon in 2010. (Doc. # 3, ¶ 19; Doc. # 65, ¶ 20.) On June 30, 2010, FTB-CO was the high and only bidder at the trustee's sale of the Real Estate, and its bid of $17,609,372.87 was accepted. (Doc. # 3, ¶ 20; Doc. # 65, ¶ 23.) The Real Estate has not yet been sold to a third party and remains in the control of the FDIC as receiver for FTB-CO. (Doc. # 3, ¶ 20.) Both Adams and FTB-NE allege that they have not received any payment under the terms of the 2008 and 2009 Participation Agreements. (Doc. # 3, ¶ 28; Doc. # 65, ¶ 27.)

4

**B.     PROCEDURAL HISTORY**

On December 2, 2010, Adams initiated *Adams I* by filing a complaint against

FTB-CO in Nebraska state court.  (*Adams I*, Doc. # 1.)  After the FDIC was appointed

as the receiver for FTB-CO, the FDIC removed *Adams I* to the United States District

Court for the District of Nebraska on March 2, 2011, and the case was stayed for 180

days while the FDIC considered the administrative claims of Adams and FTB-NE.

The FDIC denied both Adams' and FTB-NE's administrative claims and the stay

was lifted.  (*Id.*)

On December 9, 2011, FTB-NE filed suit against the FDIC in the District of

Colorado.  (Doc. # 1.)  Then, on December 30, 2011, Adams filed *Adams II* in this

district.  (*Adams II*, Doc. # 1.)  In *Adams II*, Adams brought essentially the same claims

against the FDIC as in *Adams I*, but added FTB-NE as a defendant because FTB-NE

disputed Adams' claimed LIFO priority rights.[4]  (*Id.*, ¶ 17.)  One month after *Adams II*

was filed, *Adams I* was transferred to this district from the Nebraska District Court.

(*Adams I*, Doc. # 1.)

The FDIC filed a Motion for Consolidation of Action on February 23, 2012, which

the Court granted on May 8, 2012.  (Doc. ## 14, 24.)  In these three consolidated cases,

the FDIC has filed four different motions to dismiss, all of which are ripe for the Court's

review.  In the above-captioned case, the FDIC filed its Motion to Dismiss on April 24,

---

[4]     Adams also named the FDIC in its corporate capacity ("FDIC-C") as a defendant, but the
FDIC-C was voluntarily dismissed without prejudice on June 4, 2012.  (Doc. # 40.)

2012.[5]  (Doc. # 23.)  In *Adams II*, the FDIC filed its Motion to Dismiss on May 7, 2012.[6]

(*Adams II*, Doc. # 32.)  Also in *Adams II*, the FDIC filed a Motion to Dismiss FTB-NE's

Cross-Claim on May 22, 2012.[7]  (Doc. # 37.)  Lastly, in *Adams I*, the FDIC filed its

Motion to Dismiss Third Amended Complaint on December 5, 2012.[8]  (Doc. # 75.)

## II.  STANDARD OF REVIEW

The FDIC brings the instant motions to dismiss under both Fed. R. Civ. P.

12(b)(1) and 12(b)(6).  Thus, the Court will set forth the proper standard of review

for motions under each rule.

### A.    FED. R. CIV. P. 12(b)(1)

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate

when the Court lacks subject matter jurisdiction over the claims asserted in the

complaint.  As set forth by the Tenth Circuit in *Holt v. United States*, the standard

of review for a Rule 12(b)(1) motion is as follows:

> Generally, Rule 12(b)(1) motions to dismiss for lack of subject matter
> jurisdiction take two forms.  First, a facial attack on the complaint's
> allegations as to subject matter jurisdiction questions the sufficiency
> of the complaint.  In reviewing a facial attack on the complaint, a district
> court must accept the allegations in the complaint as true.

---

[5]  FTB-NE responded on May 15, 2012, and the FDIC replied on May 29, 2012.  (Doc. ## 26, 38.)

[6]  Adams responded on June 5, 2012, and the FDIC replied on June 26, 2012.  (Doc. ## 45, 49.)

[7]  FTB-NE responded on June 12, 2012, and the FDIC replied on June 26, 2012.  (Doc. ## 48, 49.)

[8]  Adams responded on January 4, 2013, and the FDIC replied on January 22, 2013.  (Doc. ## 77, 78.)

> Second, a party may go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends. When reviewing a factual attack on subject matter jurisdiction, a district court may not presume the truthfulness of the complaint's factual allegations. A court has wide discretion to allow affidavits, other documents, and a limited evidentiary hearing to resolve disputed jurisdictional facts under Rule 12(b)(1). In such instances, a court's reference to evidence outside the pleadings does not convert the motion to a Rule 56 motion.

*Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995) (internal citations removed). The burden of establishing subject matter jurisdiction rests on the party asserting jurisdiction. *See Montoya v. Chao*, 296 F.3d 952, 955 (10th Cir. 2002).

## B.   FED. R. CIV. P. 12(b)(6)

The purpose of a motion to dismiss under Fed. R. Civ. P. 12(b)(6) for failure to state a claim is to test "the sufficiency of the allegations within the four corners of the complaint." *Mobley v. McCormick,* 40 F.3d 337, 340 (10th Cir. 1994). A complaint will survive such a motion only if it contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). For a motion to dismiss, "[t]he question is whether, if the allegations are true, it is plausible and not merely possible that the plaintiff is entitled to relief under the relevant law." *Christy Sports, LLC v. Deer Valley Resort Co., Ltd.*, 555 F.3d 1188, 1192 (10th Cir. 2009). "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quotation marks and citation omitted).

In reviewing a Rule 12(b)(6) motion, a court must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff.  *Williams v. Meese,* 926 F.2d 994, 997 (10th Cir. 1991).  Nevertheless, a complaint does not "suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"  *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 557).  "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Miller v. Glanz,* 948 F.2d 1562, 1565 (10th Cir. 1991).

In general, the Court may not consider materials outside of the pleadings on a motion to dismiss without converting the motion to one for summary judgment.  *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).  However, "the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity."  *Id.*

### III. ANALYSIS

The Court begins by providing a brief description of the history, purpose, and relevant provisions of the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA"), 12 U.S.C. § 1821,[9] in order to provide necessary context for the Court's analysis.  The Court will then address the FDIC's Motion to Dismiss Third

---

[9]   All future statutory references in this Order are to Title 12 of the United States Code.

Amended Complaint in *Adams I* because it is the earliest filed case and resolution of

that Motion may render moot the other pending motions.  Lastly, the Court will consider

the FDIC's motions to dismiss in the remaining two cases in light of the Court's analysis

in *Adams I*.

## A.    STATUTORY BACKGROUND

"Congress enacted FIRREA in 1989 'in response to the precarious financial

condition of the nation's banks and savings and loan institutions.'"  *15th & Spruce Bldg.*

*LLC v. Colo. Capital Bank*, No. 12-cv-00851, 2012 WL 6814127, at *4 (D. Colo. Nov. 30,

2012) (unpublished) (quoting *UMLIC-Nine Corp. v. Lipan Springs Dev. Corp.*, 168 F.3d

1173, 1178 (10th Cir. 1994)).  FIRREA grants broad powers to the FDIC to "deal

expeditiously with failed financial institutions."  *Id.* (quoting *Resolution Trust Corp. v.*

*Love*, 36 F.3d 972, 975 (10th Cir. 1994)); *see also* § 1821(d)(2) (listing powers of the

FDIC in its capacity as receiver).  Upon its appointment as receiver, the FDIC succeeds

to "all rights, titles, powers, and privileges of the insured depository institution . . ."

§ 1821(d)(2)(A), along with the duty to "pay all valid obligations of the insured depository

institution."  *Id.* (d)(2)(H).

The FDIC pays the obligations it acquires from depository institutions through an

administrative claims process.  Under this process, the FDIC is first required to promptly

publish and mail notice to the failed depository institution's creditors.  *Id.* (d)(3)(B)-(C).

Following notice, claimants have a limited amount of time within which to present their

claims, "with proof," to the FDIC.  *Id.* (d)(3)(B)(i).  The FDIC then has 180 days after a

9

claim is filed to decide whether to pay the claim or disallow it. *Id.* (d)(5)(A). If the FDIC disallows the claim or fails to rule promptly, the claimant may seek *de novo* judicial review. *Id.* (d)(6)(A).

Although § 1821(d)(6)(A) provides a mechanism for *de novo* judicial review, "[n]o court may review the [FDIC's] determination . . . to disallow a claim." *Id.* (d)(5)(E). Moreover, any *de novo* judicial review is limited to claims that have been properly exhausted under § 1821(d)(13)(D).[10] *Love*, 976 F.3d at 976 ("Pursuant to § 1821(d)(13)(D), a court does not have jurisdiction over a claim unless it has first been presented to the agency."); *McCarthy v. FDIC*, 348 F.3d 1075, 1077 (9th Cir. 2003) ("The text of § 1821(d)(13)(D) plainly states that **any** claim or action that asserts a right to assets of a failed institution is subject to exhaustion.") (emphasis in original). The exhaustion requirement serves two purposes: "(1) to minimize costs to the receivership estate and to the legitimate claimants who share in the distributions from the estate, and (2) to minimize the burden on federal courts by avoiding needless litigation." *Campbell v. FDIC*, 676 F.3d 615, 619 (7th Cir. 2012).

---

[10] Section 1821(d)(13)(D) provides:

> Except as otherwise provided in this subsection, no court shall have jurisdiction over –
> (i)  any claim or action for payment from, or any action seeking a determination of rights with respect to, the assets of any depository institution for which the Corporations has been appointed receiver, including assets which the Corporation may acquire from itself as such receiver; or
> (ii)  any claim relating to any act or omission of such institution of the Corporation as receiver.

The Court's jurisdiction over claims brought against the FDIC is also curtailed by operation of § 1821(j), which provides that "no court may take any action, except at the request of the Board of Directors by regulation or order, to restrain or affect the exercise of powers or functions of the Corporation as a conservator or receiver." This section was "intended to permit the FDIC to perform its duties as conservator or receiver promptly and effectively without judicial interference." *Hindes v. FDIC*, 137 F.3d 148, 160 (3d Cir. 1998). To that end, numerous courts have found that § 1821(j) presents a jurisdictional bar to various types of equitable relief. *Mile High Banks v. FDIC*, No. 11-cv-01417, 2011 WL 2174004, at *2 (D. Colo. June 2, 2011) (unpublished) (listing cases). Indeed, the D.C. Circuit has described § 1821(j) as "effect[ing] a sweeping ouster of courts' power to grant equitable remedies." *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995).

## B.   *ADAMS I* (CIVIL ACTION NO. 12-CV-00240)

Pursuant to the Third Amended Complaint (Doc. # 65), Adams brings numerous causes of action in this case, including twenty different breach of contract claims against FTB-CO and the FDIC.[11] (*See id.*, ¶ 60(a)-(j); ¶ 61(a)-(j).) Adams also brings claims for breach of fiduciary or confidential duty, conversion, unjust enrichment, assumpsit, request for imposition of a constructive trust or equitable lien, declaratory judgment, fraud, and determination of Adams' proof of claim. (*Id.* at 16-41.)

---

[11]   Specifically, Adams alleges ten breaches of the 2009 Participation Agreement by FTB-CO, and ten breaches of the 2009 Participation Agreement by the FDIC after it became receiver for FTB-CO. (Doc. # 65, ¶¶ 60, 61.)

In its Motion to Dismiss, the FDIC argues that Adams did not exhaust its administrative remedies for any of its claims, "except for its [breach of contract] claim for LIFO payment of its participation interest under the Agreement."[12]  (Doc. # 75 at 4.) With respect to Adams' LIFO breach of contract claim, the FDIC contends that the claim is not ripe for consideration because the Real Estate has not yet been sold to a third party, and so there is no requirement to disburse sale proceeds under the Agreement. Alternatively, the FDIC asserts that Adams' LIFO breach of contract claim should be dismissed under Fed. R. Civ. P. 12(b)(6) because Adams' claim for LIFO priority of sale proceeds is not plausible under a plain reading of the Participation Agreement.

    1.   Exhaustion

As previously noted, the Court lacks jurisdiction over any claims that have not "first been presented to the [FDIC]." *Love*, 36 F.3d at 976.  The Tenth Circuit has

---

[12]   The FDIC does not raise an exhaustion argument with respect to Adams' Fifth Claim (Assumpsit) or Adams' Ninth Claim (Determination of Proof of Claim).  Instead, the FDIC argues, and the Court agrees, that these two claims are duplicative of Adams' LIFO breach of contract claim.  In Adams' Fifth Claim, Adams asserts that the FDIC "ought to pay [Adams] from the purported trustee's sale proceeds [Adams'] full participation interest under the Participation Agreement." (Doc. # 65, ¶ 100.)  This turns on whether FTB-CO or the FDIC has breached the Participation Agreement and is therefore duplicative to Adams' breach of contract claim. In Adams' Ninth Claim, Adams requests a *de novo* "determination by this Court of its claims set forth in [Adams'] proof of claim."  The Court only has jurisdiction to conduct a *de novo* review of exhausted claims, 12 U.S.C. § 1821(d)(13)(D), which, as will be explained, is only the LIFO breach of contract claim.  Thus, this claim is duplicative to Adams' First Cause of Action.  Both the Fifth and Ninth Claims are therefore dismissed as duplicative.

defined the term "claim" to mean a cause of action.  *Id.*  Thus, the Court must determine

which of Adams' causes of action have been properly exhausted.[13]

On May 5, 2011, Adams submitted a formal Proof of Claim to the FDIC, stating

that FTB-CO is indebted to Adams in the sum of $4,827,644.01.  (Doc. # 75-1 at 6.)

In the "Description of Claim," Adams stated: "Loan Participation from [FTB-CO] to

[Adams] dated July 2, 2009, on a loan made to Everest Marin, LP in the amount of

$3,235,000.00 (Participation Interest)."  (*Id.*)  To this Proof of Claim, Adams attached

a sheet entitled "Everest Marin Calculations," with a breakdown of the participation

interest, lost interest, and fees totaling $4,827,644.01, its Second Amended Complaint

against FTB-CO and FTB-NE with attached exhibits, and documents regarding

$142,000 in taxes paid on the Property and the invoice for an appraisal.  (*Id.* at 7-56.)

There was no explanation of how these attachments related to the Proof of Claim.

After receiving the Proof of Claim, a claims agent for the FDIC sent Adams notice

that the Claim had been received, with the subject line: "Additional Information

Requested."  (*Id.* at 57.)  The FDIC informed Adams that its Claim would "not be

processed until you provide additional support for your claim."  (*Id.* at 57.)  On August

25, 2011, Adams submitted a letter from its counsel providing narrative support for

Adams' Claim.[14]  (*Id.* at 58-66; Doc. # 75-2 at 1-11.)  In the letter, Adams' counsel

---

[13]   Although Adams alleges that it properly exhausted all of its claims (Doc. # 65, ¶ 50), the issue of exhaustion goes to the Court's subject matter jurisdiction over the case.  Thus, the Court cannot "presume the truthfulness of the complaint's factual allegations," and may consider the Proof of Claim and attachments to the Proof of Claim in resolving whether Adams properly exhausted all of its claims.  *See Holt v. United States*, 46 F.3d 1000, 1002-03 (10th Cir. 1995).
[14] The letter was also accompanied by 64 pages of exhibits.  (Doc. # 75-2 at 12-41; Doc. # 75-3 at 1-35.)

discussed the LIFO provisions of the Participation Agreement and cited to

correspondence between then FTB-CO Chief Credit Officer Al Linton and Adams

President Chad Adams, indicating that Adams was to have LIFO priority regardless of

default.  Adams' counsel's letter concluded: "As the previous pages indicate, Adams

Bank entered into a valid, binding, and enforceable Participation Agreement with FTB-

CO.  Accordingly, Adams Bank respectfully requests that its claim be approved by the

FDIC in all respects."  (Doc. # 75-2 at 11.)  Adams' claim was disallowed by the FDIC

on November 1, 2011.  (Doc. # 75-3 at 36.)

> a)    *Alleged Breaches of Contract by FTB-CO*

In addition to its exhausted claim that FTB-CO breached the Participation

Agreement by failing to pay Adams the proceeds from the foreclosure sale on a LIFO

basis (Doc. # 75, ¶ 60(i)-(j)), Adams' Third Amended Complaint alleges that FTB-CO

breached the Participation Agreement by failing to timely send financial information to

Adams, failing to establish a committee to evaluate and elect default remedies, failing

to consult with Adams about the timing and circumstances regarding the foreclosure,

failing to provide adequate management for evaluating, monitoring, servicing and

collecting the Loan, and failing to provide adequate assurance to Adams of its intent to

honor the LIFO provision of the Participation Agreement.  (*Id.*, ¶ 60(a)-(h).)  Although

Adams asserts that it exhausted all of these breach of contract claims, Adams did not

mention any of its non-LIFO breach of contract claims in its Proof of Claim form or in

its attorney's supplemental letter.  *See Hibyan v. FDIC*, 812 F. Supp. 271, 275 (D. Me.

1993) (dismissing claims based on one contractual provision because the claimants had only administratively exhausted claims based on a different contractual provision). Thus, Adams' Third Amended Complaint "alleges entirely new legal theories that are different than those reflected in the administrative proof of claim."  *Jahn v. FDIC*, 828 F. Supp. 2d 305, 317 (D.D.C. 2011); *see also BHC Interim Funding II, L.P., v. FDIC*, 852 F. Supp. 2d 131, 138-139 (D.D.C. 2012) (listing cases dismissing claims that were not first presented to the FDIC); *Aljaf Assocs. Ltd. P'ship v. FDIC*, 879 F. Supp. 515, 518 (E.D. Pa. 1995) (holding exhaustion of contract claim did not exhaust fraud claim).

In Response, Adams points to the exhibits attached to its counsel's supplemental letter as evidence that it exhausted all of its breach of contract claims.  Some of the exhibits do obliquely refer to at least some of the non-LIFO breach of contract claims now alleged in the Third Amended Complaint.  (*See, e.g.*, Doc. # 75-3 at 10-11) (letter from President of Adams to then FTB-CO Chief Credit Officer complaining about the lack of communication from FTB-CO).  However, the FDIC was not obligated to dig through the exhibits in order to surmise what claims Adams might possibly bring.  *See Brown Leasing Co., v. FDIC*, 833 F. Supp. 672, 675-76 (N.D. Ill. 1993) (holding that the FDIC is entitled to fair notice of "the facts and legal theories on which a claimant seeks relief from the failed institution.").  As the court asked in *Ravenswood, LLC v. FDIC*, 10-cv-01064, 2011 WL 1079495, at *5 (N.D. Ill. Mar. 21, 2011) (unpublished), "how was the FDIC[ ] supposed to respond to a theory it did not know [the claimant] was presenting?"  Requiring the FDIC to predict possible theories of recovery by sorting

through exhibits attached without any explanation to a Proof of Claim "would impose indefensible costs on the FDIC and frustrate FIRREA's intended purpose of expeditiously and fairly resolving the majority of claims . . .  without protracted litigation." *Brown Leasing*, 883 F. Supp. at 676.  With that purpose in mind, courts emphasize "the importance of specificity in presenting a theory of recovery to the FDIC in a Proof of Claim."  *15th & Spruce Bldg.*, 2012 WL 6814127, at *5 (citing *Ravenswood*, 2011 WL 1079495).  Here, any vague references in the exhibits that Adams attached to its Proof of Claim did not provide the FDIC with fair notice that Adams was asserting any non-LIFO breach of contract claims.

The Court's determination that Adams did not exhaust its non-LIFO breach of contract claims is further supported by the fact that Adams did not explain how and in what amount Adams was damaged by each of the alleged non-LIFO breaches of contract.  Instead, the only amount of damages claimed by Adams was Adams' entire loan participation interest, plus interest and fees, *i.e.*, $4,827,644.01.  Nowhere did Adams request any relief specifically for any of its non-LIFO breach of contract claims.[15] *See Autumnwood Assocs. v. RTC*, No. CIV. A. 94-5961, at *2 (E.D. Pa. Aug. 2, 1995) (unpublished) (dismissing claims under Rule 12(b)(1) because the claimant had not exhausted its administrative remedies for the categories of damages sought in the lawsuit).

---

[15]    Certainly, Adams could not have reasonably expected that amount of damages for all of the alleged partial (and relatively minor) breaches.

Thus, the Court finds that Adams' non-LIFO breach of contract claims brought in the Third Amended Complaint are distinct from the claims presented to the FDIC in the Proof of Claim, and should therefore be dismissed under Fed. R. Civ. P. 12(b)(1). *See, e.g.*, *15th & Spruce Bldg.*, 2012 WL 6814127, at *6 (dismissing unexhausted claims pursuant to Rule 12(b)(1)).

b)      *Alleged Breaches of Contract by the FDIC*

In its Third Amended Complaint, Adams also brings multiple breach of contract claims against the FDIC in its role of lead lender.  (Doc. # 75, ¶ 61(a)-(i).)  It is undisputed that Adams failed to exhaust these claims; however, Adams asserts that "post-appointment claims against [the] FDIC are not subject to FIRREA exhaustion before seeking judicial review."  (Doc. # 77 at 4) (emphasis removed).  For this proposition, Adams relies on the Tenth Circuit's decision in *Homeland Stores, Inc. v. Resolution Trust Corp.*, 17 F.3d 1269 (10th Cir. 1994).

In *Homeland Stores*, the Resolution Trust Corporation ("RTC")[16] took over management of the Belmont Square shopping center.  Homeland Stores, a tenant in the shopping center, had signed a lease that guaranteed that the anchor tenant would be "similar" to the original anchor tenant and would be "acceptable" to Homeland Stores. By selecting a new, "unacceptable" anchor tenant, the FDIC allegedly breached its lease with Homeland Stores.  *See id.* at 1270-71.

---

[16]   "The powers delegated to the FDIC and the RTC are identical . . . [T]hus, the case law does not distinguish between the two and neither will the Court."  *Mile High Banks*, 2011 WL 2174004, at *1 n1.

Despite Homeland Stores' failure to exhaust its claims through the administrative claims process, the Tenth Circuit held that § 1821(d)(13)(D) did not bar Homeland Stores' claims because its claims arose solely from RTC's management of the receivership asset.  *See id.* at 1275-76.  The Tenth Circuit expressed concern that applying the plain language of FIRREA would close the administrative process to Homeland Stores and leave it without an administrative or judicial forum to raise its claims.  *See id.* at 1274 n.5.  The Tenth Circuit also relied on precedent from the Ninth and First Circuits, citing respectively *Resolution Trust Corp. v. Midwest Fed. Sav. Bank*, 4 F.3d 1490 (9th Cir. 1993) and *Heno v. FDIC*, 996 F.2d 429 (1st Cir. 1993) (*Heno I*). *Id.* at 1274-75.  The Tenth Circuit also noted that § 1821(d) refers primarily to the RTC (or FDIC) as a receiver, but the RTC's conduct in managing the Belmont shopping center fell "more squarely under the RTC's power as 'conservator.'"  *Id.* at 1275.

Although *Homeland Stores* has never been overturned in the Tenth Circuit, there is ample reason to question whether *Homeland Stores* is still good law.  Importantly, in carving out a jurisdictional exception to the exhaustion requirement, the Tenth Circuit explained that  none of the reasons it provided "standing alone necessarily dictate[d] the outcome."  *Id.* at 1275.  Rather, the Tenth Circuit stated that the various factors, "taken together," led to its holding.

As noted, one of the factors the Tenth Circuit relied upon in *Homeland Stores* was precedent from other circuits.  However, every circuit court to consider the issue since *Homeland Stores* has held that the exhaustion requirement does apply to post-

18

appointment claims.[17]  Moreover, neither of the cases that *Homeland Stores* cited are

still good law in their respective circuits.  The Ninth Circuit has explicitly disagreed with

the *Homeland Stores* approach, s*ee McCarthy*, 348 F.3d at 1081 (discussing *Homeland*

*Stores* and concluding "that claimants . . . who challenge conduct by the FDIC as

receiver, must exhaust administrative remedies before seeking judicial review"), and the

First Circuit withdrew its opinion in *Heno I*, and subsequently concluded that the RTC's

internal procedures could accommodate post-receivership claims.  *See Heno v. FDIC*,

20 F.3d 1204, 1208-09 (1st Cir. 1994) (*Heno II*).  Thus, at least one reason the Tenth

Circuit gave for its holding in *Homeland Stores* appears no longer valid.  Given that the

holding in *Homeland Stores* was based on a combination of several factors, and one of

those factors now appears invalid, it is unclear whether the Tenth Circuit would arrive

at the same conclusion that it reached in *Homeland Stores*.  Thus, to the extent that

*Homeland Stores* is still good law, the Court will construe it narrowly.

Reading *Homeland Stores* narrowly, the exhaustion requirement in § 1821(d)

does not apply when a plaintiff's claim arises solely from conduct that occurs after the

FDIC is appointed as receiver.  *See Homeland Stores*, 17 F.3d at 1271 (Homeland

Stores' claims arose solely from actions of the RTC in managing a receivership asset).

In this case, unlike in *Homeland Stores*, "the genesis of [Adams'] claim is the

---

[17]    *See Vill. of Oakwood v. State Bank & Trust Co.*, 539 F.3d 373, 387 (6th Cir. 2008);
*McCarthy v. FDIC*, 348 F.3d 1075, 1081 (9th Cir. 2003) (joining "the majority of courts in holding
that claimants . . . who challenge conduct by the FDIC as receiver[ ] must exhaust
administrative remedies before seeking judicial review"); *Stamm v. Paul*, 121 F.3d 635, 639-42
(11th Cir. 1997); *Home Capital Collateral, Inc. v. FDIC*, 96 F.3d 760, 763-64 (5th Cir. 1996);
*Hudson United Bank v. Chase Manhattan Bank*, 43 F.3d 843, 848-49 (3d Cir. 1994).

prereceivership misconduct by [FTB-CO]."  *Tri-State Hotels, Inc. v. FDIC*, 79 F.3d 707, 713 (8th Cir. 1996) (holding that *Homeland Stores* exception did not apply where the plaintiff claimed that the FDIC had failed to remedy the alleged breach of contract and fraud of the failed depository institution).  Upon review of Adams' breach of contract claims against the FDIC, the Court finds that such claims are intrinsically linked to the claims that Adams brought against FTB-CO.  (*See* Doc. # 65, ¶ 61.)  A plaintiff cannot circumvent the exhaustion requirement by challenging the FDIC's failure to reverse the failed depository institution's actions.  *See Tri-State Hotels*, 79 F.3d at 713 n.9 (observing that allowing such circumvention would "effectively eviscerate the claims process").  Moreover, unlike the plaintiff in *Homeland Stores*, Adams had (and still has)[18] an administrative forum to bring its claims against the FDIC.

Another important difference between the instant case and *Homeland Stores* is that, unlike in *Homeland Stores*, the FDIC appears to be acting as a receiver rather than as a conservator.  *See Homeland Stores*, 17 F.3d at 1275 (finding that the RTC was acting as a conservator, which suggested that Homeland's claims were not covered by the jurisdictional bar because § 1821(d) primarily refers to the RTC as a receiver).  One of the functions of a receiver is to "place the insured depository institution in liquidation and proceed to realize upon the assets of the institution, having due regard to the

---

[18]   The FDIC acknowledges that Adams' claims "are susceptible to resolution through the claims process" and urges the Court to dismiss these claims "so that [Adams'] administrative remedies can be exhausted."  (Doc. # 78 at 5.)  Courts routinely defer to an administering agency's interpretation of its enabling statute, *see Heno II*, 20 F.3d at 1209-10, and this Court will also defer to the FDIC's representation that Adams may exhaust any claims against the FDIC as receiver.

conditions of credit in the locality." *Id.* (quoting § 1821(d)(2)(E)).  In contrast, the FDIC, as conservator, is empowered to take such action as may be "necessary to put the insured depository institution in a sound and solvent condition" and "carry on the business of the institution and preserve and conserve the assets and property of the institution." § 1821(d)(2)(D).  Although this point is not well developed by the parties, and "the lines between the two functions may blur at times," *Homeland Stores*, 17 F.3d at 1275, the FDIC's conduct appears to be that of a receiver because the FDIC seems to be attempting to sell the Real Estate rather than manage it.

For these reasons, the Court finds that the *Homeland Stores* jurisdictional exception does not apply to the facts of this case.  Thus, Adams was required to administratively exhaust its breach of contract claims against the FDIC.  Because Adams failed to exhaust these claims, all of its claims concerning post-receiver conduct by the FDIC are dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).

c)     *Non-Breach of Contract Claims*

The FDIC also argues that Adams' claims for breach of fiduciary or confidential duty, conversion, unjust enrichment, request for imposition of a constructive trust or equitable lien, declaratory judgment, and fraud should be dismissed because they were not exhausted.  Adams did not mention any of these claims in its Proof of Claim or in its supplemental letter.  Moreover, any references in the attached exhibits to these causes of action, or to facts that may support these causes of action, are insufficient to exhaust these claims as the FDIC is not required to predict what causes of action a claimant

may bring.  *See Brown Leasing*, 883 F. Supp. at 675-75; *Ravenswood*, 2011 WL 1079495, at *5.  Thus, the Third Amended Complaint "alleges entirely new legal theories that are different than those reflected in the administrative proof of claim." *Jahn*, 828 F. Supp. 2d at 317; *BHC Interim*, 852 F. Supp. 2d at 138-139 (listing cases dismissing claims that were not first presented to the FDIC); *15th & Spruce Bldg.*, 2012 WL 6814127, at *5 (finding that the FDIC is not required to ensure that the asserted Proof of Claim presents the appropriate theory of recovery).  As such, Adams' claims for breach of fiduciary or confidential duty, conversion, unjust enrichment, request for imposition of a constructive trust or equitable lien, declaratory judgment, and fraud are dismissed for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1).[19]

---

[19]   The Court also lacks jurisdiction over Adams' claims for unjust enrichment, request for imposition of a constructive trust or equitable lien, or declaratory judgment because § 1821(j) prevents courts from granting equitable relief against the FDIC when doing so would "restrain or affect the exercise of powers or functions of the Corporation as a conservator or a receiver." 12 U.S.C. § 1821(j).  Here, the requested relief would restrain or affect the FDIC's power to sell the Real Estate.  *See Mile High Banks*, 2011 WL 2174004, at *2 ("the § 1821(j) bar applies to various types of request for equitable relief"); *Hindes v. FDIC*, 137 F.3d 148, 160 (3d Cir. 1998) (holding § 1821(j) precludes declaratory and injunctive relief); *Hanson v. FDIC*, 113, F.3d 866, 870-71 (8th Cir. 1997) (finding that the imposition of a constructive trust would restrain or affect the FDIC and thus the Court lacked jurisdiction under § 18212(j)); *Salzman v. Bachrach*, 996 P.2d 1263, 1265 (Colo. 2000) (holding unjust enrichment is an equitable remedy); *Freeman v. FDIC*, 56 F.3d 1394, 1399 (D.C. Cir. 1995) (describing § 1821(j) as "effect[ing] a sweeping ouster of courts' power to grant equitable remedies.").

2.    Ripeness

Although the FDIC concedes that Adams' LIFO breach of contract claim was properly exhausted, the FDIC argues that this claim should be dismissed as unripe. (Doc. # 75 at 8-12.)  Ripeness is a justiciability doctrine designed to prevent courts from entangling themselves in abstract disagreements through premature adjudication. *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004).  Thus, the ripeness inquiry "focuses not on whether the plaintiff was in fact harmed, but rather 'whether the harm asserted has matured sufficiently to warrant judicial intervention.'" *Id.* (quoting *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (citation and internal quotation marks omitted).

The FDIC argues that Adams' breach of contract claim is not ripe because the FDIC has no obligation to distribute sale proceeds to Adams until it sells the Real Estate to a third party.  Because the FDIC has not yet sold the Real Estate, the FDIC contends that the dispute is about future funds to be collected, not past, actually received "payments" that could have been made to Adams on a LIFO basis.  However, Adams has submitted affidavits from its President, Chad Adams, and from its attorney, Robert Reynolds, both of whom attest that the FDIC has already received $128,759.55 in tax refunds and distributed those refunds on a *pro rata* basis.  (Doc. # 77-1, ¶ 19; Doc. # 77-8, ¶ 13.)  Thus, the FDIC has already distributed the tax refunds on a *pro rata* basis

and, consistent with the FDIC's litigation position in the instant case, it appears that the FDIC intends to ratably distribute any collected income when it sells the Real Estate (or when it receives auxiliary income such as the tax refunds). As a result, Adams may suffer hardship if the Court withholds consideration of Adams' LIFO breach of contract claim. *See Morgan*, 365 F.3d at 890. The Court finds that Adams' LIFO breach of contract claim has sufficiently matured and is ripe for adjudication.[20]

### 3.   Failure to State a Claim

At long last, the Court proceeds to the merits of Adams' LIFO breach of contract claim. To state a breach of contract claim under Colorado law,[21] a plaintiff must sufficiently plead the following elements: (1) the existence of a contract; (2) performance by the plaintiff or some justification for nonperformance; (3) failure to perform the contract by the defendant; and (4) resulting damages to the plaintiff. *W. Distrib. Co. v. Diodosio*, 841 P.2d 1053, 1058 (Colo. 1992). The only factor that appears to be in dispute is the third factor, *i.e.*, whether the FTB-CO failed to perform under the Participation Agreement by failing to distribute proceeds to Adams on a LIFO basis.[22] In the instant

---

[20]   In its Reply, the FDIC argues that the Court should not consider the distribution of the tax refunds in determining whether Adams' claims are ripe because Adams did not exhaust any claim relating specifically to the tax refunds. (Doc. # 78 at 6.) Although Adams did not specifically discuss the tax refunds in its Proof of Claim, Adams had put the FDIC on notice that it believed it was entitled to LIFO priority on any income generated from the Real Estate.

[21]   The 2009 Participation Agreement provides that "[t]his Agreement shall be governed and construed under the laws of the State of Colorado." (Doc. # 65-1 at 3.)

[22]   In its Third Amended Complaint, Adams seems to allege more generally that FTB-CO and the FDIC breached the Participation Agreement by refusing to pay Adams from the proceeds of the foreclosure sale. (Doc. # 65, ¶ 60(i).) Whether the foreclosure sale was a "sale" that triggered FTB-CO's or subsequently the FDIC's obligation to pay Adams under the Agreement is a legal question. In its Motion to Dismiss, the FDIC asserts, and Adams does not dispute,

Motion to Dismiss, the FDIC contends that Adams' LIFO breach of contract claim should be dismissed for failure to state a claim "because the argument for LIFO priority of sale proceeds is not legally plausible under a plain reading of the Agreement."  (Doc. # 75 at 12.)

Under Colorado law, "[c]ontract interpretation is a question of law for the court to decide."  *Copper Mountain, Inc. v. Indus. Sys., Inc.*, 208 P.3d 692, 696 (Colo. 2009).  The primary goal of contract interpretation is to determine and effectuate the intent and reasonable expectations of the parties."  *Id.* at 697.  The Colorado Supreme Court has instructed courts to "interpret a contract 'in its entirety with the end in view of seeking to harmonize and to give effect to all provisions so that none will be rendered meaningless.'"  *Id.* (quoting *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1313 (Colo. 1984)).  Thus, courts ascertain the meaning of a contract by examining the contract as a whole rather than viewing clauses or phrases in isolation.  *Id.*

In interpreting a contract, courts should look beyond the four corners only if the terms of the contract are ambiguous.  *Pepcol*, 687 P.2d at 1314. "It is axiomatic that in

---

that the foreclosure sale was a "credit bid."  (Doc. # 75 at 11-12.)  Pursuant to Colorado statute, a bid in a foreclosure sale must be in the form specified in C.R.S. § 38-37-108 (*e.g.*, cash, certified check, or cashier's check), unless the bid is "by the holder of the evidence of debt." C.R.S. 38-38-106 (2012).  When the bid is by the holder of the debt, as occurred in this case, presentation of the note and entry of a credit on the debt satisfies the requirements of the statute without cash or any other form of payment changing hands.  *See Good Fund, Ltd.-1972 v. Church*, 579 P.2d 1174, 1175-76 (Colo. App. 1978).  Thus, a credit bid is "nothing more than a paper transaction."  *FDIC v. Texarkana Nat. Bank*, 874 F.2d 264, 270 (5th Cir. 1989). As such, FTB-CO's credit bid at the foreclosure sale did not trigger any duty to pay Adams proceeds from the sale as "no payment was actually received."  *Id.* (internal quotations omitted).

the absence of an ambiguity a written contract cannot be varied by extrinsic evidence."

*Id.* Whether an ambiguity exists is also a question of law. *Id.*

In the Third Amended Complaint, Adams alleges that the "Purchaser First Out"

section of the Participation Agreement entitles it to LIFO priority of any proceeds from

the sale of the Real Estate. (Doc. # 65, ¶¶ 8-10.) The "Purchaser First Out" section

states: "100% of payments until such time as Purchaser has received Purchaser's

Investment plus Interest thereon at Purchaser's Interest Rate Regardless of Default."[23]

(Doc. # 65-1.) The parties disagree as to the meaning of the term "payment" as used in

this provision. Adams asserts that the term "payment" is meant to apply to all income

generated from the Real Estate (including proceeds received from the sale of the Real

Estate), whereas the FDIC argues that "payment" is used to describe only actual funds

submitted as payments by the borrower that are applied to the Loan. (Doc. # 75 at 10.)

In attempting to discern the meaning of the "Purchaser First Out" clause, the

Court heeds the Colorado Supreme Court's instruction that the meaning of a contract

must be determined "by examining the entire instrument and not by viewing clauses or

phrases in isolation." *Copper Mountain*, 208 P.3d at 697 (internal quotations omitted).

Taken in context with the rest of the Participation Agreement, the Court finds that a plain

reading of the Agreement as a whole renders legally implausible Adams' asserted

interpretation of the "Purchaser First Out" provision.

---

[23]   Adams has referred to the Participation Agreement in its Third Amended Complaint and the parties do not contest the authenticity of the Participation Agreement. Thus, the Court may consider the provisions of the Participation Agreement without converting the instant motion to dismiss to one for summary judgment. *See Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

Although the term "payment" is not expressly defined in the "Definitions" section of the Agreement, the "Application of Payments" section distinguishes between "payment" and "collected funds."  The Agreement provides that:

> "[u]pon receipt of a payment, interest, fees, or other payments under the Loan . . . Originating Institution will promptly pay to the Participant . . . an amount equal to the Participant's Participation interest of each amount received and applied by the Originating institution in payment of principal, interest on the Loan, shared fees, or other payments in respect of the Loan.  Such application of funds shall be on a [LIFO] basis with Participant's Participation Interest being distributed first . . . ."

(Doc. # 65-1 at 1.)  Thus, "payment" is an amount paid by the borrower in partial or complete discharge of an obligation.  The "Application of Payments" section then provides that:

> "**upon the occurrence of an event of default with respect to the Loan**, all expenses incurred in collecting the Loan as well as **all collected funds shall be shared between the Originating Institution and Participant on a pro rata basis** until such default is cured."

(*Id.*) (emphasis added.)  Thus, the Agreement distinguishes between "payments" received from the borrower, and "collected funds" that are received in the event of default.  In the event of default, as occurred here, the Agreement explicitly provides that all collected funds are to be ratably shared.  Similarly, the "Borrower's Default: Enforcement" section provides that "[u]pon the occurrence of any default under the Loan Documents, . . . **[t]he Originating Institution and Participant shall share ratably in the income and expense incurred pursuant to this paragraph** . . . ."  (Doc. # 65-1 at 2) (emphasis added.)  Moreover, the "Sale of Loan Participation Interest" section provides that "[t]he sale is made by the Originating Institution without

27

recourse and **shall in no way be construed as an extension of credit by the Participant to the Originating Institution**." (Doc. # 65-1 at 1) (emphasis added.) If Adams' reading of the "Purchaser First Out" clause was correct, then the FTB-CO and Adams would have structured a lending relationship rather than a participation.[24] Thus, Adams' interpretation of the "Purchaser First Out" clause as entitling it to LIFO priority rights renders meaningless the "Application of Payments," the "Borrower's Default," and the "Sale of Loan Participation Interest" sections of the Agreement. As such, Adams' interpretation of the Agreement is not legally plausible.

In its Response to this portion of the instant Motion, Adams' silence is telling. Adam argues only that the Court should not interpret the Participation Agreement on a motion to dismiss because the Court must accept as true all well-pleaded factual allegations in a complaint.[25] (Doc. # 77 at 7). Although courts accept all factual

---

[24] In a typical loan participation, "the lead lender transfers to the participant not only the benefits to be received from a share in the underlying loan (*i.e.*, a *pro rata* share in the principal and interest payments) but also the risk of the borrower's default." *In re Sackman Mortg. Corp.*, 158 B.R. 926, 932 (Bankr. S.D.N.Y. 1983). Factors indicating that a transaction is something other than a true loan participation "include anything that indicates the participants are not subject to the normal risks of ownership . . . ." *McVay v. W. Plains Serv. Corp.*, 823 F.2d 1395, 1398 (10th Cir. 1987); *see also Sackman*, 158 B.R. at 935 ("An indicator of a disguised loan is a provision for the participant to be guaranteed repayment of its principal and interest before the lead lender is to receive its portion."); *see also* 3 Colo. Code Regs. 701-1: CB101.65(10)(b) (providing that loan participations "do not constitute loans or extensions of credit" only if "in the event of a default or comparable event defined in the agreement, participants must share in all subsequent repayments and collections in proportion to their percentage participation at the time of the occurrence of the event."). Thus, if Adams was entitled to LIFO priority under the Agreement, it would not be subjected "to the normal risks of ownership," and the Participation Agreement would not be a "true" loan participation but rather an extension of credit.

[25] Adams does not cite any authority for the proposition that a court cannot interpret a contract on a motion to dismiss, and courts routinely do so. *See, e.g., Fatell v. Stewart Title Guarantee Co.*, No. 08-cv-02521, 2009 WL 3158166 (D. Colo. Sept. 24, 2009) (unpublished) (interpreting

allegations as true on a motion to dismiss, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).   Under Colorado law, "[w]hether an ambiguity [in a contract] exists is . . . a matter of law." *Pepcol*, 687 P.2d at 1314.   The Court finds that the "Purchaser First Out" clause is unambiguous when read in conjunction with the other provisions of the Participation Agreement. Although it is not clear what the parties intended by the language of the "Purchaser First Out" provision in Adams' contract, Adams' argument that it is entitled to first priority as to any proceeds from the sale of the Real Estate (as opposed to sharing *pro rata* with other participants) is without merit.   Thus, the Court will dismiss Adams' LIFO breach of contract claim under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.   Moreover, because amendment of Adams' LIFO breach of contract claim would be futile, this claim is dismissed with prejudice.   *See Brerton v. Bountiful City Corp.*, 434 F.3d 1213, 1219 (10th Cir. 2006) ("A dismissal with prejudice is appropriate where a complaint fails to state a claim . . . and granting leave to amend would be futile.").   As all of Adams' other claims have already been dismissed for lack of jurisdiction, the Court grants the FDIC's Motion to Dismiss Third Amended Complaint (Doc. # 75) and dismisses Adams' Third Amended Complaint in its entirety.

---

insurance contract on motion to dismiss); *Vaninetti v. W. Pocahontas Props. Ltd. P'ship.*, No. 11-cv-02308, 2012 WL 4359302, at *2 (D. Colo. Sept. 24, 2012) (unpublished).

C.   *ADAMS II* (CIVIL ACTION NO. 11-CV-03404)

Adams initiated *Adams II* on December 30, 2011 (*Adams II*, Doc. # 1), almost

thirteen months after Adams initially filed *Adams I* and more than nine months after

the FDIC had removed *Adams I* to federal court.  (*Adams I*, Doc. # 1.)  Pursuant to its

Complaint, Adams brings six causes of action in *Adams II*: allowance of claim based on

participation agreement and proof of claim, breach of contract, breach of fiduciary duty,

conversion, declaration that the FDIC's disallowance is void, and declaratory judgment.

(*Adams II*, Doc. # 1 at 12-24.)  These claims, although titled somewhat differently, are

essentially identical to the claims brought in *Adams I*.  (*Compare Adams I*, Doc. # 65

*with Adams II*, Doc. # 1.)  Further, the claims in *Adams I* and *Adams II* arise from the

same factual allegations, the relief sought in the two cases is the same, and the same

parties are involved in both civil actions.  Thus, the Court dismisses Adams' Complaint

in *Adams II* as duplicative.  *See Serlin v. Arthur Andersen & Co.*, 3 F.3d 221, 223

(7th Cir. 1993) ("a suit is duplicative if the claims, parties, and available relief do not

significantly differ between the two actions."); *Park v. TD Ameritrade Trust Co., Inc.*,

461 F. App'x 753, 755 (10th Cir. 2012) (unpublished) (affirming dismissal of case as

duplicative).

FTB-NE has also brought a cross-claim for declaratory judgment in *Adams II*.

(*Adams II*, Doc. # 20.)  FTB-NE seeks a declaratory judgment that: (a) Adams' 2009

Participation Agreement is unenforceable to the extent it purports to give Adams priority

to payments from the Loan after default superior to the rights of FTB-NE or the FDIC;

(b) Adams' 2009 Participation Agreement is unenforceable pursuant to 12 U.S.C.

§ 1823(e); (c) even if Adams' 2009 Participation Agreement is enforceable, the

"Purchaser First Out" provision does not apply to income or proceeds from foreclosure

or disposition of collateral, which must be shared ratably with FTB-NE and the FDIC;

and (d) FTB-NE is entitled to its pro rata share of income and proceeds from the Loan

and collateral pursuant to its Loan Participation Agreements.  (*Id.*, ¶ 30.)  Based on

the Court's determination in *Adams I* that Adams is not entitled to LIFO priority on

any proceeds from the eventual sale of the Real Estate, FTB-NE's cross claim for

declaratory judgment is moot.  *See Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir.

2011) (holding that claims for equitable relief are moot unless a plaintiff demonstrates

"[a] likelihood of substantial and immediate irreparable injury, and the inadequacy of

remedies at law.") (quoting *O'Shea v. Littleton*, 414 U.S. 488, 499 (1974)).  The FDIC

agrees with FTB-NE that any collected income is to be distributed ratably under the

Participation Agreement, and the Court concurs with that assessment.  Thus, there is no

likelihood that FTB-NE will suffer any "substantial and immediate irreparable injury" if

the Court does not grant the request for declaratory relief, and the Court therefore

dismisses FTB-NE's cross claim as moot.

**D.     CIVIL ACTION NO. 11-CV-03231**

Pursuant to its Amended Complaint, FTB-NE brings three claims for relief against

the FDIC: (1) Allowance of Claim Based on Participation Agreement; (2) Allowance of

Claim Based on Breach of Contract; (3) Allowance of Claim Based on Fraudulent

Misrepresentation.[26]  (Doc. # 3.)  All three causes of action request "**judicial review of the FDIC's action in disallowing its claim** and entry of judgment after judicial review allowing FTB-NE's claim."  (Doc. # 3,  ¶¶ 38, 46, 56) (emphasis added.)  Although a claimant may seek a *de novo* determination of a claim under § 1821(d)(6)(A), FIRREA explicitly states that "[n]o court may review the [FDIC's] determination . . . to disallow a claim." 12 U.S.C. § 1821(d)(5)(E).  The allegations in the Amended Complaint make clear that FTB-NE is seeking judicial review of the FDIC's decision to disallow its claims, rather than a *de novo* determination of its claims.  Thus, FTB-NE's Amended Complaint must be dismissed for want of subject matter jurisdiction.  *See Muhammad v. FDIC*, 751 F. Supp. 2d 114, 121-22 (D.D.C. 2010) (dismissing complaint for lack of jurisdiction where the plaintiff alleged that the FDIC improperly disallowed his claims).

In its Response, FTB-NE seeks leave to amend the Amended Complaint in order to clarify that it "is bringing this action *de novo*."  (Doc. # 26 at 3.)  The Court denies this request without prejudice because the Local Rules of the District of Colorado provide that "[a] motion shall not be included in a response or reply to the original motion. A motion shall be made in a separate paper."  D.C.COLO.LCivR. 7.1.C.  Thus, to the extent that FTB-NE still seeks leave to amend its Amended Complaint, FTB-NE must do so by separate motion.

---

[26]   The Amended Complaint also named the FDIC-C as a defendant, and included a Fourth Claim for breach of fiduciary duty.  In its Response to the FDIC's Motion to Dismiss, FTB-NE voluntarily dismissed the FDIC-C as a defendant as well as its Fourth Claim.  (Doc. # 26 at 2.)

## IV.  **CONCLUSION**

Based on the foregoing, it is ORDERED that:

(1)     The FDIC's Motion to Dismiss Amended Third Amended Complaint in

Case No. 12-cv-00240 (Doc. # 75) is GRANTED;

(2)     The FDIC's Motion to Dismiss in Case No. 11-cv-03404 (*Adams II*, Doc.

# 32) is GRANTED;

(3)     The FDIC's Motion to Dismiss FTB-NE's Cross-Claim in Case No. 11-cv-

03404 (Doc. # 37) is GRANTED;

(4)     The FDIC's Motion to Dismiss in Case No. 11-v-03231 (Doc. # 23) is

GRANTED; and

(5)     Cases 11-cv-03231, 11-cv-03404, and 12-cv-00240 are DISMISSED.

DATED:  March __25__, 2013

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge